Abraham Schlissel, J.
Defendants here are charged in four separate and distinct counts with violations of various sections of the Municipal Code of the City of Long Beach governing maintenance and use of multi-occupied structures.
By Count 1 they are charged with owning, operating, managing and controlling “ a non-fireproof building used in whole or part as a rooming house without installing or causing to be installed therein an automatic sprinkler system throughout the entire structure and building known as premises 416 West Penn Street, Long Beach, N. Y., all in violation of Chapter 10, Article 8, Section 10-814.3 of the Municipal Code of the City of Long Beach.”
“ Count 2 alleges that they did ‘ wilfully, wrongfully and unlawfully permit a person or persons to cook in premises within a rooming house, which said rooms were not kitchens or ldtchenettes shown on a plan duly filed with and approved by the Building Dept, of the City of Long Beach, all in violation of Chapter 7, Article 1, Sec. 7-132 of the Municipal Code of the City of Long Beach.’
“ Count 3 charges that defendants ‘ did wilfully, wrongfully and unlawfully cause or permit an accessory building, located *874 in Residence “A” District, to be used for residence purposes, all in violation of Chapter 9, Article 1, Section 9-105.1 of the Municipal Code of the City of Long Beach.’
“ Count 4 asserts that these owners ‘ did wilfully, wrongfully and unlawfully cause or permit premises occupied for human habitation, to wit: a rooming house, being three (3) stories in in height and having at least five (5) habitable rooms on the third floor, without providing two (2) or more means of egress available from each story thereof, all in violation of Chapter 10, Article 11, Section 10-1107.6 of the Municipal Code of the City of Long Beach. ’ ”
Defendants attack Counts 1, 2 and 4 on constitutional and other grounds; it must be assumed that their silence as to Count 3 suggests their recognition of its constitutionality.
In their memorandum of law defendants rely on a nonconforming use resulting from a 1961 adjudication, and insist that they have a vested right to continue such use; additionally they claim and rely upon the allegedly confiscatory nature of the 1967 sprinkler ordinance, suggesting, as they do, that retroactive application thereof imposes an unnecessary hardship on them; finally they assert that they have substantially complied with the requirements of the ordinance here in issue.
The sprinkler ordinance (ch. 10, art. 8, § 10-814.3) as amended on September 12, 1967 provides, so far as presently pertinent, that ‘ ‘ Every non-fireproof building used in whole or in part as a hotel or rooming house, irrespective of when such building may have been constructed or altered, shall not later than March 1st, 1968 be provided by the owner with an automatic sprinkler system throughout the entire structure. ’ ’
The egress provisions are found in section 1107-6 of article 11 of chapter 10 of the Long Beach Municipal Ordinances and state: ‘1 There shall be at least two means of egress available from each story of every multifamily dwelling and of every rooming house if the dwelling is four or more stories in height or is three stories in height and has at least five habitable rooms on the third story. A basement used as a dwelling unit shall not count as a story for the purpose of this section. ’ ’
The court considers to be without merit and therefore rejects defendants’ contention that they are insulated from the effect of either or both of the quoted ordinances by the 1961 adjudication mentioned above. (People v. 310 Riverside Corp., a decision of this court; Adamec v. Post, 273 N. Y. 250, 258.)
In 310 Riverside, this court (whose determination was thereafter affirmed by the Appellate Term) said:
*875 ‘ ‘ It clearly appearing that enforcement of this ordinance would not render ‘ valueless substantial improvements or businesses built up over the years ’ or ‘ cause serious financial harm to the property owner ’, the 'Court has concluded that there is no merit to defendants ’ claims that they would be protected by a prior nonconforming use even if it were found as a fact that such existed.
‘ ‘ The Court believes also that the statute here under consideration represents a valid exercise of the City’s police powers and of its inherent right and obligation to protect the health, safety and welfare of its citizens. ’ ’
In so concluding this court relied upon the unanimous determination of the Court of Appeals in Adamec (supra, pp. 254-256, 259-261), where Judge Lehman declared:
1 ‘ During the last thirty-five years there have been improvements in sanitation; new devices have been invented which provide added comfort or safety; noncombustible or slow burning materials have been perfected. During these years, too, there has come a general recognition that dwellings which are unsafe or unsanitary or which fail to provide the amenities essential to decent living may work injury not only to those who live there, but to the general welfare. Economic self interest — the incentive to obtain the higher rentals which might be exacted of those able and willing to pay adequately for increased comfort and safety — would, doubtless, be a force sufficient, even without legislative compulsion, to induce the erection of some buildings which would embody the latest improvements and the most advanced ideas in safety and construction. In steadily descending scale, less conveniences, less space, less light, less air, less safeguards of health and safety, will be provided for lower rentals. At the point where economic self-interest ceases to be a sufficiently potent force for the promotion of the general welfare, or, indeed, becomes a force which may actually injure the general welfare, the Legislature may intervene and require that buildings intended for use as tenement houses or multiple dwellings shall conform to minimum standards which may reasonably be regarded as essential for safe, decent, and sanitary dwelling places.
‘1 Conformity to such standards may cause additional expense to owners of land and result in increased rentals and thus cause incidental hardship to tenants who have small incomes. Nevertheless the Legislature has power to prohibit the use of land for the erection of buildings, to be used for housing, which provide accommodations below such standards. The power of the State to place reasonable restrictions upon the use of property for *876 the promotion of the general welfare is no longer subject to challenge and regulations governing the erection or use of buildings as multiple dwellings which are reasonably calculated to safeguard the public health and safety constitute a proper exercise of that power. (Cf. Adler v. Deegan, 251 N. Y. 467.)
“ This court has said that there is no difference of principle but ‘ only of circumstance ’ between a legislative enactment of 1 conditions upon complying with which the owner might be permitted to erect a structure within the limits of a city or village or for certain purposes, and the enactment of provisions which would necessitate the alteration of structures already in existence. ’ In both cases the enactment is an attempted exercise of the police power ‘ in order to secure the general comfort and .health of the public’ and in both cases the use of his property by the owner is ‘ circumscribed and limited, what might otherwise be called his rights are plainly interfered with, and the justification therefor can only be found in this police power. ’ (Health Department v. Rector, Etc., of Trinity Church, 145 N. Y. 32, 45.)
* * *
“ The imposition of the cost of the required alterations as a condition of the continued use of antiquated buildings for multiple dwellings may cause hardship to the plaintiff and other owners of ‘ old law tenements ’ but, in proper case, the Legislature has the power to enact provisions reasonably calculated to promote the co'mmon good even though the result be hardship to the individual. ‘ It is not the hardship of the individual case that determines the question, but rather the general scope and effect of the legislation as an exercise of the police power in protecting health and promoting the welfare of the community at large. It is a well-recognized principle in the decisions of the State and Federal courts that the citizen holds his property subject not only to the exercise of the right of eminent domain by the State, but also subject to the lawful exercise of the police power ;by the Legislature; in one case property is taken by condemnation and due compensation; in the other the necessary and reasonable expenses and loss of property in making reasonable changes in existing structures, or in erecting additions thereto, are damnum absque injuria. ’ (Tenement House Dept. v. Moeschen, 179 N. Y. 325, 330.)
“'Certainly the proportion of cost of the alteration to the assessed or even the market value of the old law tenement can be no criterion of whether the Legislature has acted reasonably in requiring the alteration. The value of a tenement house decreases as year by year it becomes more antiquated, less *877 suited to its purpose and departs fu’rther from the reasonable standards prescribed by the State for such buildings; yet the same reasons which cause such decline in value may present most cogent argument that the Legislature as a condition of the continued use of these old buildings as dwellings should require alterations which will make them reasonably fit for use as dwellings according to modern standards of health, safety and decency and thus prevent them from becoming a source of danger to the community.
111 improvement or work must in itself be a reasonable, proper and fair exaction when considered with reference to the object to be attained.’ (Health Department v. Rector, Etc., supra, 41.) The object to be attained here is greater safety from fire and more sanitary conditions in tenement houses erected prior to 1901 and which do not even at this date conform to the standards set for all buildings erected since 1901. It does not appear and it is not claimed that the alterations are not reasonably calculated to attain their object and it can hardly be argued that the imposition of a cost of $5,000 to attain that result in a tenement house containing forty rooms is unreasonable even though it may cause hardship in an individual case. Because the iState has tolerated slum dwellings in the past, it is not precluded from taking appropriate steps to end them in the future. When a building used as a dwelling house is unfit for that use and a source of danger to the community, the Legislature in order to promote the general welfare may require its alteration or require that its use for a purpose which injures the public be discontinued; and subject to reasonable limitation, the Legislature may determine what alterations should be required and what conditions may constitute a menace to the public welfare and call for remedy. The result, as we have said, may be the closing of many tenement houses and the eviction of the tenants. Argument may be made that before the Legislature causes the closing of tenement houses because they are unfit for habitation, provision should be made for better housing elsewhere for the evicted tenants. Such arguments must be addressed to the Legislature. The plaintiff cannot complain to the courts because the Legislature has decided otherwise.”
Upon the authorities above mentioned this court concludes that the two ordinances here attacked are prima facie valid enactments, and defendants’ challenge of their constitutionality and enforceability is overruled.
Defendants’ second argument, i.e., as to the assertedly confiscatory nature of the ordinance is rejected for the reasons hereinbefore stated.
*878 Defendants ’ third point, namely, that they have allegedly substantially complied with the involved ordinances would ordinarily be reserved for determination at trial hereof. It may, however, be here noted that this court in People v. Morris Cohen (Docket No. 174/69) has already ruled upon and rejected substantially the same arguments here advanced on defendant’s third point. Since there is no substantial fact question with respect to this area of contention, there would appear to be no purpose in requiring trial hereof.
This court is most conscious of the problems which these ordinances and their vigorous though somewhat belated enforcement impose upon many property owners such as these defendants. It is, however, equally conscious of the fact that the safety and protection of our people against undue hazard is one of the prime functions of government and that the hand of progress may not be stayed by mere considerations of asserted economic hardship.
Each owner of any property and particularly of a multitenanted dwelling must, it seems to this court, be deemed to have purchased same with a consciousness of the possibility (if not indeed, in these volatile times, of the probability) that new technological developments and sociological advances would insistently and inescapably require the installation of newly perfected protections of life and limb. It would be a strange kind of government and a particularly hazardous way of life where all advance was confined to newly erected structures while those residing in older buildings were condemned to exposure to dangers which latter-day research had developed means to prevent or, at the very least, to minimize.
As was said over 50 years ago by the first Mr. Justice Gavegan in Cockcroft v. Mitchell (101 Misc. 211, 217-218, affd. 187 App. Div. 189, affd. 230 N. Y. 630):
“ It is true that these provisions constitute a forward step in remedial legislation, quite in advance of anything heretofore undertaken by the legislature in the exercise of its police powers. It is also true that in many instances, clearly so in the case at bar, compliance with these provisions may entail hardship upon the owners of buildings which at the time of their erection fully complied with all existing provisions of law. Hardship, however, does not mean confiscation, and unless it results from the unreasonable exercise of arbitrary power on the part of the legislature, no degree of hardship can justify the court in nullifying legislative enactments embodying the will of the people, since it is the primary duty of the legislature to protect the common interests of the whole people, even at the expense of *879 personal or local interests. The mere fact that the law cannot be enforced without causing expense to the citizen who comes within its provisions furnishes no constitutional 'obstacle to such enforcement. Dept. of Health v. Trinity Church, 145 N. Y. 32. That the police powers of the state include everything essential to the public safety, justifying the destruction or abatement of public nuisances, even to the demolition of buildings in the path of conflagration, has long been settled law. The fact that the exercise of the power may disturb the enjoyment of individual rights without compensation for such disturbance does not make laws and regulations of a public nature unconstitutional, for they do not appropriate property for public use, but simply regulate its use and enjoyment by the owner. Dept. of Health v. Trinity Church, supra. If the extent of the injury which' would be inflicted upon private individuals were controlling upon the constitutionality of the act, then it would be difficult, if not impossible, to have any fixed criterion, since the cost of compliance in some cases might be very small, while in others it might equal, or even exceed, the equity of the owner. Such considerations are proper to address to the Legislature, but not to the court. Tenement House Dept. v. Moeschen, 89 App. Div. 526. Even assuming that the law were ‘ mischievous in its tendencies, * * * the responsibility therefor rests upon the legislators, not upon the courts. No evils arising from such legislation could be more far-reaching than those that might come to our system of government if the judiciary, abandoning the sphere assigned to it by the fundamental law, should enter the domain of legislation, and upon grounds merely of justice or reason or wisdom, annul statutes that had received the sanction of the people’s representatives. * * * ’ it is the solemn duty of the courts * * * to guard the constitutional rights of the citizen against merely arbitrary power, it is equally their duty to recognize and enforce legislative enactments embodying the will of the people, unless they are plainly and palpably, beyond all question, in violation of the fundamental law of the Consti-. tution.” Atkin v. Kansas, 191 U. S. 207-223.
“ Merely because it is a step in advance, section 79-b of the Labor Law cannot be said to be plainly and palpably in violation of the Constitution. It is rather one of those amendments to the structure of the law now being made with increasing frequency by a legislature which recognizes the trend of modern thought with respect to social justice.”
The court has, of course, read and considered defendants’ memorandum of law, as well as the various cases cited and •relied on by them.
*880 It seems to it that defendants’ reliance upon such determinations as People v. Perkins (282 N. Y. 329) and Matter of Humble Oil $ Refining Co. v. Worthington (49 Misc 2d 432) is misplaced and that neither they nor any of the other authorities referred to by them support their position here.
Insofar as Perhins is concerned, it is sufficient to note that no one challenges the bald statement that a vested nonconform-; ing use may not be terminated by municipal action; however, it is equally true that while the 1 ‘ use ’ ’ may not be interfered with, the means whereby such use may be regulated may be up-dated in response to expanding discoveries and technological and sociological advances (see authorities, supra, this opinion).
Humble is, in this court’s judgment, entirely irrelevant, dealing as it does with a restricted fact pattern and concerned as it is with questions of reliance and estoppel such as do not exist here.
No one can safely rely upon a freeze of the areas of knowledge as to what can and should be done in the protection and preservation of human life. We who have become so accustomed to the invention and perfection of multitudinous instruments of destruction should be equally prepared for discovery of new means of continuation and expansion of the life span.
In conclusion the court finds that the two ordinances here challenged represent valid and reasonable exercises of the legislative function with which this court has neither the right nor the desire to interfere.
The parties having stipulated that no fact issues here exist, no trial appears necessary; defendants’ guilt is accordingly adjudged as to all four counts and they are directed to appear before this court on October 17, 1969 for imposition of appropriate sentence.